## HAZELTINE CORPORATION v. ABRAMS et al.

No. 7238.

District Court, E. D. New York.

Aug. 6, 1934.

Pennie, Davis, Marvin & Edmonds, of New York City (Willis H. Taylor, Jr., and Baldwin Guild, both of New York City, of counsel), for plaintiff.

Darby & Darby, of New York City (Samuel E. Darby, Jr., of New York City, of counsel), for defendants.

GALSTON, District Judge.

This is a patent infringement suit in which infringement is alleged of letters patent No. 1,879,863, issued September 27, 1932, to Harold A. Wheeler on an original application filed July 7, 1927, divided and then filed on November 13, 1930.

The patent relates to the radio art, and particularly to means for controlling volume control in a receiving set.

In the course of the trial the suit as against the defendants Emerson Television-Radio, Inc., and Emerson Radio & Phonograph Corporation was dismissed because neither corporation has a regular and established place of business within the Eastern district of New York, nor did it appear that they had committed any acts of infringement within this district.

Benjamin Abrams, the individual defendant, is the president of both of those corporations. He resides within the Eastern district of New York, but it does not appear that Abrams as an individual committed any acts of infringement either in this district or elsewhere.

■ The plaintiff seeks to hold Abrams on the theory that the Emerson Television-Radio, Inc., is the alter ego. Clearly, it appears that a suit for infringement cannot be maintained against an individual who is not alleged to have infringed, except in his official capacity as an officer of the corporation. Moreover, there is no proof that the corporation is insolvent. Bowers v. Atlantic, Gulf & P. Co. (C. C.) 104 F. 887.

However, the evidence proves that the Emerson Television-Radio, Inc., is the alter ego of Abrams. He owns only 5 per cent. of the Emerson Television-Radio, Inc. The other 95 per cent. was issued to Mathew Lauer, who paid $9,500 therefor in October, 1932, some months after the corporation was organized. In February, 1933, Lauer sought to borrow $15,000 from Abrams, who, while not in position to advance this sum personally, did agree that the Emerson Television-Radio, Inc., might make a loan of $9,500. From the time of this loan no interest was paid thereon by the borrower. Apparently no demand for the payment of principal and interest was made upon him. Since Lauer has received back the entire amount of his investment, in such circumstances it would appear that except for the period from October, 1932, to February, 1933, to all intents and purposes, Abrams was the sole stockholder of the corporation. The testimony also convinces me that he is the only officer who is active therein.

■ It would follow, therefore, under the doctrine of Weston Electrical Instrument Co. v. Empire Electrical Instrument Co. (C. C. A.) 177 F. 1006, 1007, that Abrams would be held for the corporate wrongdoing. It was said in that case: "This court absolutely and entirely rejects the not uncommon view that the fiction of distinct corporate existence can be made to serve as a shield against the consequences of individual wrongdoing. Upon the presentation of a case showing active participation by an officer of a corporation in the infringement of a patent, we have been, and shall be, not slow to disregard the corporate device and enforce personal responsibility."

See, also, Saxlehner v. Eisner (C. C. A.) 147 F. 189, and Claude Neon Lights, Inc., v. American Neon Light Corporation (C. C. A.) 39 F.(2d) 548.

The difficulty with the conclusion reached is that the Emerson Television-Radio, Inc., has not within this district committed any act of infringement, so that if a decree were to issue in this case it would not be for actual, but only threatened, infringement. Edison Electric Light Co. v. Packard Electric Co. (C. C.) 61 F. 1002.

The Davega-City Radio, Inc., the remaining defendant, is a retail dealer in this district, and distributed the alleged infringing device, referred to in the case as "Emerson Model 39" receiver, subsequent to the issuance of the patent and to March 10, 1934, the effective date of cancellation of the Emerson Television-Radio, Inc., license agreement with the plaintiff.

The plaintiff asserts an estoppel as to the defendant Abrams because the Emerson Model 39 receiver in evidence bears a metal plate patent license marking notice, setting forth that the receiver is licensed under the plaintiff's patents, though the license agreement had been terminated.

Walker on Patents (6th Ed.) at page 436, states: "Where a license is really forfeited, and the licensee continues to work under it as though it were still in force, the licensor has an option to sue him as an infringer, or to sue him for the promised royalties. If he selects the first of these remedies, the act of the owner of the patent is regarded as a repudiation of the license, and the license being at an end and the contractual relation having ceased, the infringer may interpose any defense that he could have set up in the absence of a license. An exception is where the licensee continues to hold forth to the public by marking the articles with the patented stamp that he is manufacturing under the patent."

The exception noted might very well be held to be sound, as was indicated in Regina Music Box Co. v. Newell (C. C.) 131 F. 606, if it appeared that there had been a deliberate effort to hold out to the public the existence of a license after termination; but in this case it appears that Abrams gave oral instructions to the secretary of the Television Company and also to the production manager that the Hazeltine license plates should no longer be affixed to Emerson receivers. Obviously, if despite these instructions there had been such production in quantity in the affixing of the notice in violation of the oral order, one might impute guilty knowledge to Abrams. But the proof falls short of this, and in consequence I do not believe that he is estopped from asserting invalidity.

Certainly the Davega-City Radio, Inc., is not so estopped. It appears that prior to the commencement of the present action, the Davega-City Radio, Inc., together with a number of other defendants, were charged with the infringement of the patent in suit. The Zenith Corporation, as the manufacturer of the apparatus, undertook the defense. The case was settled and a consent decree was filed. That decree provided: "8. That this decree shall not prejudice defendant, Davega-City Radio Inc.'s rights in any case brought against this defendant by the plaintiff herein, because of the sale or use by the said defendant of radio receiving apparatus other than said 'Zenith' apparatus."

That reservation in the decree certainly reserves to the Davega-City Radio, Inc., the right to assert any and all defenses that it so elects in the present suit, for the Emerson 39 is not the Zenith apparatus, though it may be similar in principle.

We come then to the merits of the litigation. The specification sets forth a difficulty in sound reception which the inventor sought to obviate. He aimed to prevent the overloading results in distortion of the reproduced signal. Another advantage sought is uniform reproduction of the amplified signal, irrespective of whether the carrier-current signal is received from a nearby station, from a distant or a high-power station, or a low-power station, since "it has been found in former radio receivers that when the receiver was reproducing strong signals as from a nearby, or a high-power station, the audibly reproduced signal was very loud, whereas when the signal was received from a distant, or a low-power station, it was relatively weak, with the result that if signals were to be reproduced uniformly from both near and distant stations, and from high-power and low-power stations, it became necessary to readjust some volume controlling means in the receiver to compensate for these unequal signals."

Claims 1, 5, 6, and 10 are in issue. The defenses are invalidity and noninfringement.

Though there has been prior litigation on the Wheeler patent, there has been no adjudication on its merits. There is, however, pending in this court a suit against the R. E. B. Service Corporation by reason of the sale by that defendant of Bosch, Colonial, and RCA-Victor receivers. A first suit against the same defendant, alleging infringement from the sale of the Kolster Model K–130, resulted in a default by this defendant; and in consequence a preliminary injunction in the second suit was granted by Judge Moscowitz, because as to validity the default decree was res adjudicata, and no issue of infringement had been raised by the defendant's affidavits presented at the hearing. A trial on the merits has since been had, with the issue limited, by reason of the defendant's prior conduct, to the question of infringement; but as yet no decree has been filed.

Automatic volume control, as defined by the Standardization Committee of the Institute of Radio Engineers, is "a self acting device which maintains the output constant within relatively narrow limits while the input voltage varies over a wide range."

As a factor in the invention, Wheeler employs as the rectifier tube a two-electrode "Fleming" valve or a three-electrode vacuum tube having its grid and its plate directly connected together to comprise in effect a single anode.

Fig. 1.

Referring to Fig. 1 of the patent, we find three radio frequency amplifier tubes arranged in series. The output circuit of the third vacuum tube is connected to the input of a detector or rectifier tube. The patentee states that the "terms 'rectifier' and 'detector' are, in general, used interchangeably, the terms 'rectifying' and 'converting' being employed in the general sense to include the process of changing alternating current into a form of direct current or modulated unidirectional current."

The output circuit of the rectifier is coupled to the input circuit of an audio frequency amplifying tube. In the operation of the receiver shown in Fig. 1, a signal intercepted on the antenna 5 is successively amplified through the neutralized radio-frequency stages in the three vacuum tubes. This amplified signal voltage is then rectified by the rectifying tube, and the rectified pulsating current is successively amplified by the audio amplifying stages including two vacuum tubes, after which it may be reproduced as sound by the loud-speaker. The patentee provides means whereby, when the rectified or converted signal current flowing through the resistance 51 is greater than a predetermined value, there is developed at the terminal 52 sufficient negative biasing voltage which in turn is impressed through a conductor 36 upon the grid of the first amplifying tube to reduce the amplification of that tube. The specification recites: "It will be apparent that as the magnitude of the rectified current flowing through resistance 51 decreases with weaker signals, the voltage at terminal 52 becomes less negative, and the negative biasing voltage impressed upon the grid 11 also diminishes so that the vacuum tube 9 effects an increased degree of amplification."

Langley, the plaintiff's expert, summarizing the invention, was of the opinion that Wheeler had provided means by which the anode of the detector could be maintained normally negative and which would become increasingly negative in the presence of an amplified signal; also he effected a direct current connection from the anode of the detector tube to the control electrode of an amplifier tube or tubes. Through this path the increasingly negative voltage on the output electrode of the detector is fed back to the control electrode of the amplifier automatically to regulate its amplification in proportion to the strength of the received signal.

But the defendants urge that there is no basis afforded in the specification to support the limitation in the claims that in order to effect automatic volume control the anode of the detector must be maintained normally negative relative to the cathode of the amplifier tube; nor does it appear by a necessary implication. Langley made some admission to this effect in the following question and answer: "XQ392. Will a direct current connection from the anode of the rectifier in Fig. 1 of the Wheeler patent to the grid electrode of the amplifier, the first amplifier in the high frequency amplifier stages, control the amplication of the amplifier tube, the controlled amplifier tube, irrespective of whether the anode of the rectifier is positive or negative? A. I will have to get the form of that question. (Question repeated by the reporter.) A. Yes, with this comment, that, of course, the connection won't control the amplifier, but the voltage that is sent back to the amplifier over the connection will, and that you can vary the grid potential of an amplifier positive and negative over a considerable range, and the amplification will de-

pend at any moment on what its grid voltage is."

Moreover, the patent itself in Fig. 4, which represents the Wheeler invention embodied in a radio receiver, including a two-stage radio frequency amplifier, a detector, and a two-stage audio frequency amplifier, discloses an arrangement for effecting automatic volume control and employs a battery in the plate filament circuit of the rectifier whereby the anode is maintained positive to the filament of the controlled amplifier tubes. It makes no difference, so far as the automatic volume control circuit is concerned, whether the plate of the detector is maintained negative or positive relative to the filament of the amplifier, according to the Wheeler specification.

The matter of automatic amplification control, a term that expert Langley urges as more accurate than "automatic volume control," according to his view presents a very complicated problem. In the United States there are ninety-six broadcast channels. On each of these channels there may be more broadcast stations. Each is identified by a particular carrier frequency. The receiving set is arranged to select any one of these carrier frequencies. Usually, at any receiving location, as a result of the assignment of these frequencies, there is only one signal on each channel which is loud enough to be heard. The signal, as is known, radiates in all directions from the transmitter, and its intensity at the receiving point is, roughly, inversely proportional to the square of the distance.

There is no battery voltage supplied across the detector or rectifier tube, and the potential of its anode is, therefore, not determined by a battery. There is an electron stream from the hot cathode of the detector tube, and that electron stream is capable of carrying an electric current only in one direction through the tube. Without any signal at all present across the tube, some of these electrons would strike the anodes of the tube, and that would result in a small continuous current or direct current in the output circuit of the tube. This small current, when no signal is present, goes through the resistance 51. The small direct current which goes through the resistance 51 creates a small voltage drop in that resistance, and that causes the anodes of the tube to be slightly negative at all times with reference to the cathode of the tube.

The cathode of the detector tube is connected directly to the cathode of the amplifier tube. The result is that the anode of the detector tube is normally slightly negative relative to the cathode of the first amplifier tube.

Now then we come to the consideration of a detector tube when a signal appears across this tube. This is at a time after the signal has passed through the three amplifiers and has been selected by the tuned circuits. The signal thus passed to the detector tube tends to apply an alternating voltage across that tube; that is, a voltage which is first positive and then negative. Moreover, the signal is modulated, either by voice or musical content, and its amplitude will vary up and down, that is, the size of each high frequency cycle varies; so that, as this voltage crosses the detector tube and as often as the anodes of the tube become positive, there is a current through the resistor, in addition to the small negative current, which has heretofore been described.

The negative cycles of the signal voltage cannot send any current through the detector tube or through the resistor because the tube is capable of carrying current in only one direction. Hence, as the signal is impressed, there is a pulsating direct current dependent upon the strength of the signal flowing through the resistor. A voltage developed across the resistor may be applied to the control electrode of the first high frequency amplifier, and that control electrode is isolated from the cathode of the first tube so far as its direct current potential is concerned, in order that the control electrode may be so controlled from the point 52, illustrated in Fig. 1.

Claim 1 in issue may be taken as a typical claim. It reads: "1. In a signaling system a vacuum tube amplifier having a cathode and a control electrode, a vacuum tube detector coupled to said amplifier, said detector having an output electrode, means for maintaining said output electrode normally negative relative to at least part of said amplifier cathode, means for causing said output electrode to become more negative in the presence of an amplified signal, and a direct-current connection between said control electrode and said out-put electrode, whereby the amplification of said amplifier is regulated automatically."

Invalidity is asserted because of lack of invention and anticipation. Most of the patents in evidence were cited during the prosecution of the Wheeler application in the Patent Office, but greater insistence at the trial was placed upon those patents that were not cited.

It is urged that patent No. 1,574,780, to Affel, constitutes a complete disclosure of the

Wheeler patent. This patent relates to devices and means for variably controlling the amplitude of the output current from a transmission circuit with reference to the amplitude of the input current applied by the circuit.

It may be noted that the grid filament circuit of the first tube of the Wheeler arrangement is the input circuit of that tube, and, as Langley admitted, an alternating current is applied to the input circuit of that tube; also, that the alternating voltage passed across the detector tube corresponds in amplified form to the alternating current originally applied to the input circuit of the vacuum tube amplifier, which thus results in the production of a rectified direct current.

The Affel patent shows an amplifying tube associated with a rectifying tube. The third electrode of the rectifier is negative normally relative to the filament of the amplifier tube by reason of a resistance. This resistance is not dissimilar in function to that shown in the Wheeler patent.

It also appears that the anode of the rectifying tube shown in this patent becomes increasingly negative in the presence of an amplified signal.

Moreover, the patent indicates that there is a direct current connection from the anode of the rectifier to the grid or input circuit of the amplifier, and that this is for the purpose of controlling the amplification of the amplifier tube. This direct current connection, as traced by defendants' witness Dumont, may start with the anode of the detector tube, thence to the left-hand connection or to the resistance 4, through the transformer 1, through the battery 5 to the grid of the amplifier tube.

It would thus appear that Affel discloses a combination which in operation and result meet the alleged novelty of Wheeler's arrangement.

Applying the Wheeler claim 1 to the Affel disclosure, we find a transmission system, which after all is also a signal system. A vacuum tube amplifier having a cathode and a control electrode is the tube 18; it has a vacuum tube detector R T coupled to the amplifier. This detector tube has an output electrode, i. e., a plate electrode, and the resistance 4 is the "means for maintaining said output electrode normally negative relative to at least part of said amplifier cathode." The same resistor constitutes the "means for causing said output electrode to become more negative in the presence of an amplified signal." Affel also discloses a direct current connec-

tion between the control electrode and the output electrode as that heretofore traced.

Claims 5 and 6 are the same as claim 1, and any reference to claim 1 is equally applicable to claims 5 and 6.

Claim 10 differs from these claims in narrowing the detector to a diode form of tube; but since the function of each was at the time of the Wheeler application so well understood in the radio field, there can be no invention in the substitution of the diode for the three-electrode vacuum tube.

At the time of the filing of the Wheeler application, July 17, 1927, the employment of a diode as a rectifying tube was shown by Heising in patent No. 1,687,245, on application filed December 30, 1922, and in Schelleng, No. 1,836,556, filed November 4, 1924.

Langley asserts that the Affel patent does not define the structure described by Wheeler, because, among other reasons, the amplifier is not coupled to the detector. I confess I do not appreciate the force of this assertion. Certainly, the Wheeler claims make no reference to a particular form of coupling, and certainly the resistance 4 effects a coupling relationship between the rectifier and the amplifier.

Indeed, there are many differences attempted to be drawn by the witness Langley as to function and result between the Affel patent and the patent in suit, but that is not the logical basis of comparison. The claims of the Wheeler patent are under consideration. They must be tested by the disclosures of the prior art. It may well be that if the Wheeler claims in issue were narrowed to the improvements defined in his specification, weight could be attached to the Langley comparison. That, of course, is not permissible, since it would mean a rewriting of the claims.

Patent to Heising, No. 1,687,245, October 9, 1928, relates to the amplification of modulated waves, and more particularly to the amplification of modulated high frequency waves for radio transmission. The application was filed December 30, 1922. Heising's system comprises a series of amplifiers and a rectifying tube. The operation of the Heising system is such that with an increased signal a larger current flows through the rectifier tube. This causes an increased voltage drop through the resistance 12. This resistance is so connected that the grids of the amplifier tube 5 become more negative. The patent reads: "A rectifier is connected across the input circuit in such a manner that the application of waves to be amplified to the input circuit causes the grid to become more

914

negative as the amplitude of the applied waves becomes larger."

Unlike that shown in the Affel patent, the rectifying tube used by Heising is a two-electrode rectifier.

The battery 10 and the resistance 12 in Heising maintain the plate electrode of the detector tube negative relative to the cathode of the amplifying tube 5. In function the resistance 12 of the Heising system corresponds with the resistance 51 of Wheeler. Moreover, there is a direct current connection from the plate electrode of the rectifier to the grid electrode of the succeeding amplifier.

In dealing with this patent, plaintiff's expert, Langley, suggested differentiation based, among other things, upon the circumstance that this patent, like that of the patent to Affel, is in the transmitter art; that it shows a progressive amplification as distinguished from the regressive type, which he found in the Wheeler arrangement; and that there is no time delay arrangement, which he finds in the Wheeler patent.

It may well be that since the Heising patent states, "the power consumption in the amplifier 7 and 8 is too small to necessitate the application of the invention to their input circuits," that Heising's invention was not intended for use in receivers, where the power consumption of the amplifier tubes is relatively small. But whether this be so, there is nothing in any of the claims in issue which in terms at least includes the time delay provision referred to in the Wheeler specification. This same observation applies to the attempted distinction drawn between regressive and progressive amplification. Langley's differentiation is extremely interesting and doubtless sound, but the claims of the patent are silent on the subject.

Finally, the same observation must be made with respect to the first asserted difference. The Heising arrangement is described as applicable to a transmission system. Whether the fundamental problem in automatic volume control is radically different in a receiving system from a transmission system occurred to me at the trial and led to interrogation of the experts on this subject. They were of different mind. On the whole I am unable to see that there is any radical difference. Apparently both systems operate on the same principle and employ similar circuits and instrumentalities.

The claims of the Wheeler patent are not limited to a reception system. Each claim refers to a signaling system. Such a term is sufficiently broad to include a transmission system.

Hence, to avoid the disclosures of the Heising patent, it seems to me that the claims in issue would have to be narrowed in the foregoing three important respects.

Patent to Bjornson, No. 1,666,676, granted April 17, 1928, on an application filed June 27, 1925, relates also to transmission systems. This patent adds nothing to that shown in Affel, No. 1,574,780.

The patent to Schelleng, No. 1,836,556, granted December 15, 1931, filed November 4, 1924, broadly relates to amplifying systems. It is interesting because it shows a diode form of rectifier.

Though Friis, No. 1,675,848, Affel, No. 1,511,015, Evans, No. 1,736,852, and Falknor, No. 1,698,014, formed part of the prior art discussed at the trial, it is not necessary to enter into a description of them here. They were all cited during the prosecution of the Wheeler application and are not so pertinent as the Heising, Affel, and Bjornson patents referred to hereinbefore in this opinion.

■ From the foregoing view it follows that claims 1, 5, and 6 are void for want of invention, because of Affel patent, No. 1,574,780, Heising patent, No. 1,687,245, and Bjornson patent, No. 1,666,676.

■ Claim No. 10 is void for want of invention because of Heising patent, No. 1,687,-245. The Affel and Wheeler patents substantially disclose the system described in this patent, but they do not show a diode detector; and since the Affel and Bjornson applications were copending with the Wheeler application, one may not supplement the disclosure of these two applications by that of Heising, which was likewise copending, to build up an anticipation. So much seems to be inferable from Alexander Milburn Company v. Davis-Bournonville Company, 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651; Sparks-Withington Co. v. E. A. Laboratories (D. C.) 295 F. 534.

Before concluding, I may say that in the matter of commercial success, if the question of invention even were doubtful, I could not be persuaded, since there is no affirmative evidence that the Wheeler patent by itself has met with commercial success. The various license agreements referred to include a number of patents, in addition to the Wheeler patent; and there was no effort made in the proof adduced at the trial to attribute success in the art solely to the Wheeler patent.

The conclusion of invalidity reached is forced also by a recent decision of the Circuit Court of Appeals of this circuit. In Technidyne Corporation and Lester L. Jones v. McPhilben-Keator, Inc., 72 F.(2d) 242, it was said: "Many patents have been issued in this well-developed field, and, as indicated by the date of their issuance, all are of recent grants. Since the radio art was well developed, the standard of inventive thought to sustain a patented radio tube or circuit necessarily is higher than in the earlier history of the art. Kintner v. Atlantic Communication Co., 230 F. 829 (D. C.), affirmed 240 F. 716 (C. C. A. 2); Dubilier Condenser Co. v. Aerovox Wireless Corp., 37 F.(2d) 657, 660 (C. C. A. 2); Radio Corp. v. Dubilier Corp., 59 F.(2d) 305 (C. C. A. 3); Western Electric Co. v. Wallerstein, 60 F.(2d) 723 (C. C. A. 2)."

The Jones patents there under consideration presented, broadly, the question of whether what the inventor had accomplished was the result of only the skill and knowledge of the electrical engineer. In the state of the art the same test seems equally applicable to Wheeler's contribution.

The defendants may have a decree dismissing the bill.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.