## CINCINNATI RUBBER MFG. CO. v. STOWE-WOODWARD, INC.

No. 8212.

Circuit Court of Appeals, Sixth Circuit.

April 12, 1940.

Frank Zugelter, of Cincinnati, Ohio (Arthur C. Denison, of Cleveland, Ohio,

and Frank Zugelter, of Cincinnati, Ohio, on the brief), for appellant.

Frank H. Stewart and L. G. Miller, both of Boston, Mass., for appellee.

Before HICKS, SIMONS, and ARANT, Circuit Judges.

HICKS, Circuit Judge.

Stowe-Woodward, Inc., appellee, sued The Cincinnati Rubber Manufacturing Company, appellant, for infringement of Claims 1, 2 and 7 of Woodward Reissue Patent No. 18,111, June 23, 1931. The District Court held the claims valid and infringed. The defenses relied upon here are: Lack of invention; non-infringement; anticipation; and invalidity, for ineffectiveness of the disclaimer, and of the reissue.

The patent is for a "roll" and is in the paper making art. Paper stock in its first stage is ninety-nine per cent water and about one-half of one per cent fiber. This mixture is delivered to a traveling wire mesh supported by rollers. The water content is gradually reduced and the fibers are lightly settled by a wire mesh roller until the mass, still about eighty-five per cent water, becomes a homogeneous continuous web. The web is now ready for the press section which is made up of a series of two rollers each, between which the web is passed on a supporting felt. It is in this section that the paper is formed and given its desired quality.

In modern mills paper is manufactured by a continuous operation from mixing trough to winding rolls on a single large and costly machine. When the machine is working properly the web, sometimes fifteen to eighteen feet wide, moves at speeds often as high as eight hundred feet per minute and after the pressing operation it may be guided around a score or more of drying rolls before it is wound upon the reels. Carrying the paper mass from the screen through the press rolls was subject to great risk. The evidence is that the sheet is very wet and tender and its structure easily disturbed. It will not hold together by itself and must be supported into the bight of the press rolls upon the felt, which absorbs some of the water and imparts motion to the top press rolls.

The top press rolls come directly into contact with the fibrous web and if they have any tendency to pick up any of the fibers the sheet will be damaged, or worse, breaks will occur and play havoc with the desired continuous operation.

Williamson, appellee's witness, testified that the original rolls in the paper making machines were steel, top and bottom. "As machinery became faster, and we transposed from rag paper making to wood-fibre paper making, the top wooden roll was developed ... the next evolution of rolls was the brass roll, and some years later, the gun metal, bronze and other alloys. Then there was the evolution of the granite roll, I am referring now to top roll position. In the meantime the bottom roll position had been evolved with a rubber covered roll." Finally, a suction roll was evolved for the bottom but Williamson testified—"In the normal presses without the suction roll the last evolution was this Stoneite" (covered by the patent in suit) "working in conjunction with a rubber covered roll at the bottom." The upper roll came in direct contact with the fibrous mass, while the lower one was insulated therefrom by the supporting felt.

There were various disadvantages in the earlier top press rolls. Those made of wood sometimes had troublesome knots or while in operation a film would form upon their surface which would pick up small particles and spoil the finish of the paper. The roll then had to be scraped. When it was not in use the wood roll had to be kept moist to prevent cracking. Otherwise top press rolls were operated in conjunction with a scraper or "doctor" just back of their center to catch fibers which might be picked up, or to catch the sheet if it broke. Brass and bronze rolls scored easily when hard substances got under the doctor and would mark the finer grades of paper. While granite rolls solved several problems, they raised others. Film formed on them although not as frequently as on other rolls. But the solid block of granite was often too heavy for certain types of paper and tended to wear out the felts. It also happened occasionally that the bearings upon these granite rolls would become heated and crack and destroy the roll. Some of the disadvantages of wood and granite rolls are set forth in the specification to the Joseph patent No. 2,062,317 December 1, 1936, under which appellant manufactured the alleged infringing roll.

In his specification Woodward states that his principal object is to "provide an acting surface or periphery to which material will not adhere when such material passes

along or around said roll and while my roll is especially useful as a top press roll in paper making machines to prevent the pulp from sticking to the rolls, it is useful for other rolls in paper making and elsewhere."

The specification further states—"A feature of my invention is to use a plurality of pieces of rock or stone for a portion of the active surface of the roll and under the generic term rock I include, for example, granite, sand, gravel, quartz and emery." These pieces of material, ground to pass through a 20 mesh sieve and to stay on a 60 mesh sieve, he embedded in a rubber compound or binder, which he vulcanized around a cast iron core. His preference was for "crystalline rock such as granite or sand." The specification further states that with his use of rock, there was no tendency to produce a glazing action on the face of the roll tending to cause the paper to stick.

The claims were—

"1—A roll comprising pieces of rock forming a portion of the active surface of the roll; and a binder of material other than said rock for holding said pieces in the desired position."

Claim 2 was more explicit, specifying "crystalline" rock and a "rubber" binder.

"7—A top press roll comprising pieces of rock forming a portion of the active surface of the roll; and a rubber binder holding said pieces in the desired position."

We think the claims are valid. The combination of—(1) pieces; of (2) rock, forming (3) a portion of the active surface of the roll; and (4) a rubber binder holding said pieces in the desired position, was new and useful for the purposes set forth in the specification. The composition roll was not as heavy as granite and was about fifty per cent cheaper. It had commercial success and its utility is admitted. We think it constituted an advance of decided merit.

To support its contention that the claims are anticipated, appellant cites patents for clothes wringers, fruit presses, and for reducing wood to pulp. These patents are in a remote, non-analogous art and do not anticipate. National Hollow B. B. Co. v. Interchangeable B. B. Co., 8 Cir., 106 F. 693, 702.

We think that the only pertinent prior art is that of the earlier paper rolls. Those most pertinent are the patents to Griffith, No. 1,537,439, May 12, 1925, and to Adams and Woodward, No. 1,563,943, December 1, 1925. These patents were for vulcanized rolls with porous surfaces.

Griffith used a vulcanized rubber press roll rendered porous or cellular at its circumference by mixing into the rolls particles of cotton, felt, fiber, sawdust, and the like. He also recorded the possibility of mixing with the rubber composition carbonate of soda or ammonia, which substance would be vaporized by the heat of vulcanization, leaving air cells.

Adams and Woodward working upon the same principle, mingled sugar or common salt, which being soluble in water, would dissolve out in use, leaving numerous holes uniformly dispersed.

Neither the Griffith nor the Adams and Woodward patents made any impression upon the art. Woodward, although not the first to use vulcanized rubber in connection with other materials, departed from the teachings of Griffith and Adams and Woodward, in using "rock" or "stone." Griffith and Adams and Woodward did not anticipate.

Appellant contends that conceding invention, its roll did not infringe. The Joseph roll used particles of blast furnace slag instead of the "rock" or "stone" particles used by Woodward. In appearance the rolls were similar except in the color of the rubber bond even though the slag particles were broken somewhat, due to grinding the rolls in the manufacturing process.

Joseph, in his specification, says that his slag particles are less abrasive than crystalline particles such as granite and did not wear out the doctors as rapidly. The negative of this contention is found in the testimony of appellant's witness, Von Schlichten, that a "hardness determination of the material in Duratex" showed it to have a "hardness of 5, or perhaps a little less. Some of it certainly was 5. And the hardness of the ingredients in Stonite was found to be, respectively, 6 and 7." We do not think that the disparity between the hardness of the Duratex slag and the Stonite ingredients is sufficient in itself to remove the slag from the range of equivalents.

We have noted that Woodward in his specification included as examples "under the generic term rock," granite, sand,

gravel, quartz and emery. Appellant's witness, Von Schlichten, a geologist, testified that "rock is a more or less homogeneous structural unit of the earth's crust ... and therefore must be a natural formation"; that "slag is a by-product of the industry for recovering metals from ores"; and that slag is not in the category of rock. But this same witness testified that, of the five substances given by Woodward as examples "under the generic term rock," quartz and emery fall within the classification of "minerals" rather than of "rocks." This indicates that Woodward was exercising his prerogative "to supply his own dictionary" (Jones v. Sykes Metal Lath & Roofing Co., 6 Cir., 254 F. 91, 96) and in his specification was using the term "rock" in some other than its technical geological sense, and that the hard, rock-like slag, even though artifically produced, falls within the range of equivalents for the specified use. This conclusion has support in the fact that Woodward in his specification uses the terms "rock" and "stone" as synonymous.

Appellant attacks the claims on the ground that they are too broad; that sand was not useful in the patented roll. Sand had been used in two instances of experimental rolls ordered for special purposes and had proven ineffective; but we do not think that this evidence satisfactorily rebuts the usefulness of sand.

■ It is also contended that the term "binder" is too indefinite. Appellant points out that in the field of rubber there are soft binders and hard binders and that the claims do not specify the particular binder requirements. This point is not well taken. In National Battery Co. v. Richardson Co., 6 Cir., 63 F.2d 289, 293, this court said: "Those skilled in the art cannot be expected to understand the terms used as including those proportions * * * which would be ineffective to produce the desired results." Patentee was seeking by his new roll to improve the results which those familiar with the art would know to have been achieved by perfectly functioning metal and granite rolls, namely, an untorn paper strip of uniform thickness, of smooth and unmarked surface. As was said in Sun Ray Gas Corp. v. Bellows Claude-Neon Co., 6 Cir., 49 F.2d 886, 888,—"* * * a claim is not invalidated by the omission of that which * * * is easily supplied by one skilled in the * * * art." We do not think that one versed in the art and

following the patent would have any difficulty in choosing between the hard and soft binder.

■■ Appellant attacks the reissue. In the original patent, Woodward, No. 1,-787,890, January 6, 1931, the specification states that pieces of rock formed "at least a portion of the active surface of the roll." The words "at least" and the statement that the lack of adhesion might be due to porosity of the rock, were struck from the reissue specification and there were added two references to size classification of the rock particles used, and the word "further" was added at the beginning of the last sentence of the specification, noting the economy in the manufacture of the patented roll. There were no changes in the drawing or claims. The changes in the specification were in the interest of accuracy, as to nonessential matters, and of elaboration and explanation. The reissue came within six months of the original. Its propriety was a question primarily for the Patent Office. Van Kannel Revolving Door Co. v. Winton Hotel Co., 6 Cir., 276 F. 234, 238. See also Walker on Patents, Deller's Ed., Vol. II, Sec. 320, p. 1364. And we think the affidavit to the effect that the patentee, not being a patent attorney, had not appreciated the significance of certain phraseology appearing in the original and the desirability of other matter omitted therefrom, is adequate.

■ Appellant questions the validity of the disclaimer. It was filed October 2, 1935, more than four years after the reissue. We quote it in full:

"It disclaims in line 9 of the specification the words 'and elsewhere.'"

"Under claims 1, 2, 3, 4, 5, 6 and 8 it disclaims from the scope of said claims all rolls, if such be in law comprehended by said claims in their present form, other than paper machine rolls for operation in contact with a moist web."

The disclaimer of the words "and elsewhere" confined the patent to paper making machines. As applied to the claims, the disclaimer limited them to rolls in a paper making machine which came "in contact with a moist web."

A disclaimer that limits claims by exclusion of a part to a field they might in their original form have covered, is proper. Byrne Mfg. Co. v. American Flange & Mfg. Co., 6 Cir., 87 F.2d 783, 784, and cases there cited.

Appellant claims that the disclaimer was not timely, citing the Maytag cases, Maytag Co. v. Hurley Mach. Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264. These cases hold that the patentee must promptly move to disclaim when he becomes aware he has claimed too much. Appellant asserts that patentee knew he was not a first inventor of his roll for any purpose at the time of the reissue. This is an assertion only. The awareness must be brought home to patentee. In Ensten v. Simon Ascher & Co., 282 U.S. 445, 453, 51 S.Ct. 207, 209, 75 L.Ed. 453, it was said: "Delay begins whenever the patentee becomes aware that he has claimed more than he has invented or described. In cases where the excess is not apparent at once upon the inspection of the patent by the patentee, the allowance of his claim by the patent office raises such a presumption in its favor that he may rely on its validity until a court of competent jurisdiction decides that it is broader than his real invention." This rule was recognized in Excelsior Steel Furnace Co. v. Williamson Heater Co., 6 Cir., 269 F. 614, 619. It is sufficient to say that in the Maytag cases the disclaimer did not follow promptly upon a court determination that an almost identical claim was invalid. We do not think there was any fatal delay in filing the disclaimer.

Our conclusion is that Claim 1 as limited by the disclaimer, is valid, and infringed; that Claim 2, so limited, is valid but is not infringed since it calls for crystalline particles; and that Claim 7, specifically directed to a top press roll, is valid, and infringed.

The decree, as modified, is affirmed.