## DETROLA RADIO & TELEVISION CORPORATION v. HAZELTINE CORPORATION.

### No. 8632.

Circuit Court of Appeals, Sixth Circuit.

Dec. 9, 1940.

Samuel E. Darby, of New York City (Samuel E. Darby, of New York City, Henry P. Rosin, of Detroit, Mich., and Floyd H. Crews, of New York City, on the brief), for appellant.

William H. Davis, of New York City (Pennie, Davis, Marvin & Edmonds, William H. Davis, and R. Morton Adams, all of New York City, on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

Appeal from a decree holding Reissue Patent 19,744 valid and infringed, and granting appropriate equitable relief. All of the claims except claim 8 are in suit. The reissue patent was granted on October 29, 1935, on an application therefor dated September 26, 1934. The original patent (1,879,863) was issued September 27, 1932, to Harold A. Wheeler, on a divisional application dated July 7, 1927. The appellee is assignee of the patent and the reissue.

The patent is for a hook-up circuit for a radio broadcast receiver, and relates to "amplifiers utilized in modulated carrier-current signaling systems wherein the limit of amplification is automatically maintained substantially at a predetermined level." The purpose of the invention, as stated in the specifications, is automatically to control the volume of the amplified signal voltage where amplifiers are employed and thus to effect "automatic amplification control." The patented device

is used today in all well-known radio receivers manufactured in the United States. Over four million Philco receivers utilizing the Wheeler method of automatic volume control had been sold up to the time of trial, and much of their success is attributed to the use of the Wheeler diode system.

In addition to the usual defenses of lack of invention and non-infringement, appellant asserts that the reissue patent was not properly granted because (1) a patent held invalid as disclosing no invention cannot be validly reissued; (2) the statutory requirements were not complied with; and (3) laches intervened.

Claims 1, 5, 6 and 10 of the original Wheeler patent were held void in the Eastern District of New York (Hazeltine Corp. v. Abrams, 7 F.Supp. 908, 914) on the ground that they disclosed no invention over Affel, 1,574,780, Bjornson, 1,666,676, and Heising, 1,687,245. These patents had not been cited by the Patent Office in the proceedings with reference to Wheeler's application for the original patent. Affel and Heising relate to transmission systems only. Langley, expert for the Hazeltine Corporation in the trial in the District Court of New York, testified that Affel and Heising did not anticipate because Wheeler's device related solely to the radio receiver. The District Court held that the original Wheeler patent was not limited to a receiving system because each claim referred to a "signaling system," and therefore considered that the differentiation suggested by Langley was not stated in the claims. The court in its opinion (7 F. Supp. at page 913) suggested the narrowing of the claims, stating that "It may well be that if the Wheeler claims in issue were narrowed to the improvements defined in his specification, weight could be attached to the Langley comparison. That, of course, is not permissible, since it would mean a rewriting of the claims." The Second Circuit affirmed the judgment of the District Court (Hazeltine Corp. v. Abrams, 79 F.2d 329), although it differed from the District Court with reference to the scope of the Wheeler patent, indicating that consideration of the claims in the light of the specifications showed that Wheeler's device was intended to be limited to a radio receiver. However, it agreed with the District Court that the patent disclosed no patentable invention. Prior to the decision in the Second Circuit appellant had applied for a reissue in which the scope of the original claims was narrowed substantially in accordance with the suggestions of the District Court, and the reissue patent was subsequently granted.

Appellant urges that a patent held to be invalid because it discloses no patentable invention, as is the case here, cannot be cured by reissue. It relies strongly for this contention upon Penn Electrical & Mfg. Co. v. Conroy, 3 Cir., 185 F. 511, which states broadly that where a patent for a process has been adjudged invalid for lack of patentable invention in that the process was not new, the case is not one of insufficiency, overstating, inadvertence, accident or mistake entitling the patentee to a reissue. That was a case in which the validity of the reissue patent was attacked by the same party which had attacked the validity of the original patent, and therefore an issue of res judicata was involved. The alleged infringer here was not a party to the Hazeltine case decided in the Second Circuit. In Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 18 F.2d 66, where a similar contention was made with reference to the validity of the reissue, and where the parties, as here, were not identical, the court stated that the decision in the former suit was not conclusive in a second suit involving other parties, even though the original patent had been declared invalid for anticipation, and the Penn Electrical & Mfg. Co. case was distinguished. Also in the Penn Electrical & Mfg. Co. case the court stresses the fact that the "vice" of the original patent was not that a patentee had claimed as new more than he had a right to claim, from which observation an inference might well be drawn that in such case the Third Circuit would have held the reissue valid. Here the reissue patent was applied for on that specific ground. The court in the Hazeltine case (7 F.Supp. at 914), had stated that Wheeler, in the original patent, had claimed more than he had a right to claim as new, and Wheeler, in his application for reissue, conceded the fact and relied on it. We conclude that the Penn Electrical & Mfg. Co. case is not controlling here.

A ruling diametrically opposed to that sought by appellant, to the effect that a valid reissue may be granted where the original patent has been declared invalid, was announced by this court in Van Kannel Revolving Door Co. v. Winton Hotel

Co., 276 F. 234. In that case the reissue patent had been attacked upon the ground that the original patent had been declared invalid. The court, at page 238 of 276 F., said:

"The specification of the 1906 patent was broad enough to support the claims contained in the reissue. There was no change in the drawings, and the changes made in the specification were only in the interest of further elaboration and explanation. They introduced no substantial new matter. The substantial basis of the application for reissue was that the claims were not commensurate with the invention. If Van Kannel, through his solicitor, without intending to do so, drafted or accepted claims not commensurate with the invention, such act is an 'inadvertence' within the meaning of Rev.Stat. § 4916 (Comp.St. § 9461 [35 U.S.C.A. § 64]), which entitled him to a reissue. What constitutes the 'same invention' is not to be determined by the claims of the original patent, but from the description and such other evidence as the commissioner may deem relevant. Whether the act was inadvertent is a question primarily for the Patent Office, whose decision will not be reviewed unless inconsistent with other facts appearing in the record. American Co. v. Porter [6 Cir.] 232 F. 456, 146 C.C.A. 450. It is not important whether the patentee considered the claims, as drawn, too broad, rather than too narrow. Claims may be either narrowed or broadened to express the real invention. American Co. v. Porter, supra; Specialty Co. v. Ashcroft [2 Cir.] 213 F. 35, 40, 129 C.C.A. 629; Robert v. Krementz [3 Cir.] 243 F. 877, 881, 156 C.C.A. 389. In our opinion the decision of the Patent Office that the reissue was proper is not inconsistent with facts otherwise appearing in the record. The proposition that the original claims were not sufficient to protect the real invention is not overthrown by the fact that the holdings of invalidity of the claims of the 1906 patent, so far as made, were based upon lack of invention."

This case is squarely controlling here. Wheeler introduced no new matter, and the application for reissue showed that the claims as originally drafted were not commensurate with the invention. The fact that the original patent was held invalid does not defeat the reissue patent. Cf. Maitland v. B. Goetz Mfg. Co., 2 Cir., 86 F. 124, in which the patent had also been held invalid upon the ground of lack of invention, but the reissue was sustained.

Appellant urges, however, that the application does not comply with the statute and is false on its face. It relies upon the fact that the original oath filed with the petition for reissue recited no facts tending to show inadvertence, accident or mistake, as required by Rule 87 of the Rules of Practice of the United States Patent Office,[1] and also upon the fact that Wheeler himself is a radio patent expert, and therefore could not have drawn the original claims inadvertently. But the examiner, citing Union Switch & Signal Co. v. Louisville Frog, Switch & Signal Co., 6 Cir., 73 F.2d 550 (C.C.A. 6), notified Wheeler of the insufficiency of the oath upon the ground that it did not comply with the rule. Wheeler then filed an amended and supplementary oath in which he stated that in the original patent application he had claimed as his invention "more than he had a right to claim as new," specified that the claims embodying such improper claims were 1, 5, 6, 9 and 10 of the original patent, and set forth in detail the fact that the specifications described a radio receiver to which certain of his claims did not apply; that he was not apprised of this fact until the adverse decision in the District Court (Hazeltine Corp. v. Abrams, supra), and that the reissue was sought in order that the claims might be made to correspond to the invention. While Wheeler has prepared numerous applications for patents in radio matters, it appears that in this particular patent application his work was directed mostly toward the examination of the specifications describing his device, already successfully operated and publicly demonstrated, and that he took the advice of his solicitor with reference to the drafting of the claims. It was agreed by both parties in the findings of fact that the applications for the original patent and for the reissue

were prepared by Wheeler's patent solicitor in close collaboration with Wheeler, and that this was done "honestly without fraudulent or deceptive intention, and without intending to claim as Wheeler's invention or discovery more than he had a right to claim as new." This finding of fact disposes of any issue of fraud or deception. If as a matter of law drafting claims not commensurate with the invention revealed in the specifications constitutes inadvertence, unless deliberate or fraudulent, then the essential facts were set forth in the application for reissue, and in the amended and supplemental oath. But the fact that Wheeler unintentionally and in reliance upon his solicitor drafted or accepted claims not commensurate with the invention disclosed in the specifications, constitutes an inadvertence within the meaning of the statute. American Automotoneer Co. v. Porter, 6 Cir., 232 F. 456, 460; Van Kannel Revolving Door Co. v. Winton Hotel Co., supra. There is no conclusive evidence here, such as existed in the Union Switch & Signal Co., case, supra, that there was no accident, inadvertence or mistake, and upon this point we see no reason for overruling the decision of the Patent Office. Cf. Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc., 6 Cir., 111 F.2d 239, 242.

■■ Nor is the reissue patent invalid because of laches in the application. The original patent was issued September 27, 1932, and the application for reissue was filed September 26, 1934. It was not until August 6, 1934, that the District Court in New York held the claims invalid, and Wheeler became aware for the first time of the possible necessity of canceling the claims. The appellee was entitled to rely upon and litigate the original claims, and had a right to wait for the decision of the Circuit Court of Appeals before definitely abandoning them. Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc., supra; France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605, 610; Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949. As Wheeler's reissue was a narrowing, instead of a broadening reissue, the doctrine of equitable estoppel declared in Sontag Chain Stores Co., Ltd. v. National Nut Co., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204, does not apply.

■ Appellant relies upon Maytag Co. v. Hurley Machine Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264, as authority for a further contention that the reissue patent is invalid because it failed to disclaim all of the invalidated claims of the original patent. This decision, which covers a case where a patentee had unreasonably neglected and delayed in suing upon or disclaiming a claim not definitely distinguishable from another adjudged invalid for anticipation and disclaimed, is not in point here, where claim 1 of the reissue patent is not in substance the same as claim 10 of the original patent. In addition to what was formerly described, claim 1 adds the essential element of the "high resistance connected between the rectifier anode and the amplifier cathode." The language of the Maytag decision (307 U.S. at page 245, 59 S.Ct. 857, 83 L.Ed. 1264) in fact supports the right of appellee to sue upon claim 1 of the reissue.

■■ We next consider the questions of patentability and invention, and on these points the decree also must be affirmed.

Wheeler's patent relates to volume control in a radio receiver. Claim 1 is typical, and is printed in the margin.[2]

The carrier wave which is sent out through space from the broadcasting station is a high-frequency wave modulated at the transmitter by a low-frequency wave superimposed upon it. This wave is a high-frequency oscillation which when received at the antenna of the radio receiver vibrates so rapidly that the ear cannot detect it. In the receiver, the carrier wave is amplified and then conducted through the detector, where it is rectified so that it becomes a unidirectional or direct current. The rectified signal varies in accordance with the signal modulated by the sound

---

[2] Claim 1. "In a signal receiver having a carrier-frequency amplifier which includes at least one vacuum tube having a cathode and a control electrode, a two-electrode rectifier coupled to the output circuit of said amplifier, a high resistance connected between the rectifier anode and the amplifier cathode, means including said resistance for maintaining the average potential of said anode normally negative relative to at least part of said amplifier cathode and increasingly negative with increasing amplified signal output from said amplifier, and a direct-current connection from said anode back to said amplifier control electrode whereby the amplification of said amplifier is regulated automatically."

wave at the transmitter and reproduces the original signal, which after amplification is conducted to the loud-speaker to be heard by the listener. In the early period of radio, problems of "blasting" and "fading" developed, to the solution of which Wheeler's device was particularly directed. Blasting is the term applied to the harsh and distorted sounds that came from a radio receiver of the earlier type, when the operator tuned from a weak to a strong station. When a weak signal was received, a high degree of amplification was employed in the receiver in order to make the weak signal audible at the loud-speaker. If this degree of amplification was retained when the operator tuned in on a strong station, the signal was over-amplified and the operator was compelled to adjust not only for tuning to wave length, but also for volume control. Fading was due to atmospheric conditions which caused signals to vary in intensity, changing from strong to very weak signals. Wheeler's invention secured automatic compensation for inequalities in the received radio-frequency signal, with corresponding increase or decrease in the degree of amplification, so that the amplification of the strong signals would be toned down and the weak signals would be strengthened.

Wheeler's drawings disclose a three-stage radio-frequency amplifier followed by a rectifier, a two- or three-stage audio-frequency amplifier, and a loud-speaker embodied in a complete radio receiver. The rectifier employed is a two-electrode rectifier. The radio-frequency amplifier amplifies the incoming signal intercepted on the antenna through the successive stages. The amplified signal current is then rectified, and the rectified pulsating current, after being successively amplified by the audio-amplifiers, is reproduced as sound at the loud-speaker.

The gist of the invention, as disclosed in the specifications, lies in the fact that the degree of amplification effected in the radio-frequency amplifier is automatically controlled by a biasing potential obtained by rectifying the modulated signal carrier in a two-electrode rectifier having a high resistance connected between the filament and the anode of the rectifier through which the pulsating rectified current flows, thereby developing a negative voltage which is applied to the grid of the first radio-frequency stage. When the rectified signal current increases with signal output beyond a predetermined value, there is developed at the anode terminal of the rectifier sufficient increase of the negative biasing voltage, which in turn is impressed upon the grid of the first stage amplifier to reduce amplification of this tube. Conversely, as the magnitude of the rectified current decreases with decreasing signal strength, the voltage at the anode terminal of the rectifier becomes less negative, and the negative biasing voltage impressed upon the grid diminishes so that the first radio-frequency amplifier effects an increased degree of amplification. Thus the volume of the reproduced signal is substantially uniform under all conditions.

An important feature of the Wheeler device is its use of the diode. The vacuum tube originally used for detection consisted of two electrodes, called diode. As the art developed, a third electrode or grid was interposed between the cathode and anode, thus constituting the triode. The triode could be used for amplification as well as detection, and hence for a number of years in the radio art it replaced the diode. The voltage upon the grid (sometimes called the grid bias or potential) is negative, relative to the potential of the filament, and repels the electrons which are emitted from the cathode as the current flows through the circuit, prevents or controls their attraction by the positive plate or anode, and thus decreases and controls the amplifying power of the tube. The use of the negative bias for this purpose was old in the art. Where former inventors had derived their control potential through the triode, from the B battery, Wheeler, using the diode, derived it directly from the amplified signal.

Appellant urges that there is no invention in the use of the diode as opposed to the triode; but Wheeler's device does not merely embody the diode. It discloses the use of the diode united with a high external resistance opposed to the relatively low internal resistance of the diode, with a consequent linear response which results in better automatic volume control than had ever before been secured. We agree with the District Court that this combination of the diode and the high resistance creating the negative bias at the grid in direct proportion to the amplified modulated carrier voltage is a new and useful improvement in the radio art, requiring the exercise of inventive genius. The device secures

automatic volume control. The elements of the combination were old, but the combination was new, and the result was new. This constitutes invention. Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 6 Cir., 106 F.2d 554, 557.

In the triode, energy is obtained from an external source or battery, and not from the amplified signal. The control bias voltage is dependent upon the battery voltage. Therefore, in the three-electrode detector circuits, an adjustment must be made in order to increase or decrease the requisite amplification to compensate for variations of signal strength. In Wheeler, the resistance which is high compared with the resistance of the diode, makes the diode a minor element in determining the voltage of the rectified signal. This record supports the assertion of the specifications that as the diode rectifier does not amplify, is not critical, and requires neither anode nor biasing battery, Wheeler requires no adjusting device, such as a potentiometer, to accommodate the control bias to any particular combination of tubes and B battery voltage.

Another important feature of Wheeler is that the device secures linear response. Since the control voltage is derived directly from the amplified signal, it is always directly proportional to the amplified signal voltage, and the "average signal amplitude which is equal to the carrier wave amplitude and independent of the degree of modulation" is kept constant. But in a triode such as was used at the time of Wheeler's invention, the rectified voltage was proportional to the square of the applied voltage, and not directly. It was admitted by Kelly, appellant's expert, that a diode detector used in series with the high resistance gives linear response, that the use of the triode results in a "square law action," and that to get any linear characteristic using a a triode, both the B battery potential and the C battery potential have to be increased. He could not recall any radio receiver using a triode that was linear in its action. These distinct changes in

operation work a substantial advance in automatic volume control.

The patent is not anticipated. Affel, 1,574,780, and Friis, 1,675,848, use the triode detector, and therefore do not secure the linear characteristic of Wheeler. Affel develops his control potential before amplification, and therefore, as appellant's expert testified, cannot secure a signal strong enough for linear rectification. Heising, 1,687,245, uses a diode, as also does Sleepian, 1,455,768. But the purpose of these two patents is entirely distinct from Wheeler, and neither of them attempts nor secures automatic control. Heising's device is for use in a transmitter. Sleepian does not have a constant potential, and he uses his diode for the purpose of making the response proportional to the signal received.

Experts for both parties agree that the disclosure closest to Wheeler is Evans, 1,736,852 and 1,869,323. Evans also discloses the use of a triode, and does not produce the current for biasing the grid control from the amplified and rectified signal, but produces it from a battery. The control potential, therefore, depends upon the adjustment of the B battery and the C battery to the triode which in addition has a non-linear characteristic.

Appellant contends that its device is patterned after Evans and the other above-mentioned patents; but there is no merit in this contention. While appellant uses a multi-purpose tube which contains a diode and triode, it concedes that it employs the diode only for the purpose of automatic volume control. It secures its energy just as Wheeler, from the amplified signal itself, and uses a high resistance through which it develops the linear characteristic with the resulting control voltage which is directly proportional to the amplified signal voltage. These features are the gist of the Wheeler invention, and appellant has paid the compliment of adopting them. As held by the District Court, appellant's receivers embody the invention disclosed in the reissue patent.

The decree is affirmed.