**Gabe KAIMOWITZ,**
**Petitioner–Appellant,**

**v.**

**The BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,**
**Respondent–Appellee.**

**No. 90–3067**
**Non–Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 27, 1991.

Gabe Kaimowitz, pro se.

Jim Michaels, Federal Reserve System, Legal Div., Washington, D.C., Ben Johnson, First Union Corp., Alston & Bird, Atlanta, Ga., for respondent-appellee.

Before FAY, CLARK and BIRCH, Circuit Judges.

PER CURIAM:

This case presents a question as to whether petitioner has standing to bring suit. · Petitioner, who is an attorney, claims to have represented a number of minority businesspeople in the Orlando, Florida area. When the First Union Corporation applied under the Bank Holding Company Act of 1956 [1] for permission from the Federal Reserve Board to acquire Florida National Banks of Florida, Inc., petitioner submitted comments on his own behalf protesting the planned acquisition. Petitioner objected to the acquisition on the grounds that First Union had failed to meet its obligations under the Community Reinvestment Act (CRA), which requires federal financial regulators "to use [their] authority when examining financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered." [2] Petitioner alleged that First Union had "misrepresented its role concerning blacks and the poor in Orange County [Florida] in its CRA Statement." [3] Petitioner also alleged that minority contractors received loans from First Union only when they were "fronting" for non-minority developers.

The Federal Reserve Board eventually approved First Union's application to acquire Florida National Banks, notwithstanding petitioner's protestations. However, in its approval order, the Board characterized an examination of First Union's CRA performance undertaken by the Office of the Comptroller of the Currency (OCC) as follows:

> The OCC recently completed its CRA examination of First Union's national bank subsidiaries and found a number of deficiencies in the CRA performance of the subsidiaries in North Carolina, Florida, South Carolina and Tennessee. First Union's North Carolina, Florida, Tennessee, and South Carolina banks did not have an established system to determine the credit needs of their communities on a regular basis. The examination found that the banks did not regularly advertise the products that were designed to assist low- and moderate-income and minority areas. In addition, the banks did not have an adequate method for reviewing the geographic distribution of their loans and deposits. Based upon its examination of these banks, the OCC concluded that a number of First Union subsidiary banks had an overall CRA rating that was less than satisfactory. [4]

The Board remarked, "[T]he Board believes that the results of the OCC's examination findings regarding the past CRA performance of First Union's subsidiary banks, if considered alone, would require a negative finding...." [5] However, the Board went on to note that First Union had promised to implement a number of programs specifically to address its CRA deficiencies. It concluded: "In light of the significant public benefits that may be expected from First Union's proposal to make its financial and managerial resources available to Florida National and the significant steps taken by First Union to improve the CRA performance of its bank subsidiaries, and based on all the other facts of record in this case, the Board believes that First Union's CRA record does not, when viewed in the context of the overall convenience and needs of the community, preclude approval of these applications." [6] The Board conditioned its approval on First Union's implementation of all the remedial programs it had agreed to undertake. [7]

Petitioner, acting as both client and attorney, requested that this court review the Board's approval, claiming to be a "party aggrieved by an order of the Board" under 12 U.S.C. § 1848. Because we find that petitioner does not possess sufficient standing to maintain this action, we dismiss the petition.

The Supreme Court has written,

---

1. 12 U.S.C. §§ 1841–50.

2. 12 U.S.C. § 2901(b).

3. R3–725.

4. R12–2988 (Board Order, at 13).

5. R12–2989 (Board Order, at 14).

6. R12–2992 (Board Order, at 17).

7. *Id.*

In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society.[8]

Thus, petitioner must satisfy both the constitutional and prudential components of standing doctrine.[9] But we will address only the constitutional component of standing, as we find that petitioner has failed to clear this initial hurdle.

In *Allen v. Wright*,[10] the Supreme Court described the standing required by the Constitution: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."[11] One aspect of such Article III standing is that the plaintiff must claim that he or she personally has suffered or will suffer some injury: "[T]he plaintiff ... must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants."[12]

In petitioner's brief-in-chief, he only claims to assert the rights of third parties, the minority businesspeople whom he has represented, to CRA compliance.[13] Apparently realizing the problem this approach to standing creates with respect to the "personal injury" component of standing, petitioner takes a slightly different tack in his reply brief and asserts his own rights. He contends that he has standing based on a liberty interest in his business reputation that is threatened by First Union's alleged misrepresentations about its CRA performance.[14] In this regard, petitioner argues that he is an aggrieved party because his reputation is at stake with his primarily black clientele, who have been harmed by First Union's "redlining" practices (that is, the practice of denying loans in certain neighborhoods). Petitioner seems to claim that the Board's reliance on First Union's representations of future commitment to minority and low- and moderate-income communities undermines his credibility, because he has sought to persuade his clients that First Union's credit performance for these communities has been inadequate and remains suspect.

We fail to understand the sense in which petitioner's reputation can be said to have been injured. As we quoted above, the Board specifically found that First Union had been remiss in CRA compliance. The Board expressly conditioned its approval of First Union's application on an improvement in First Union's community lending practices. The Board also cautioned First Union that it "should not consider further bank expansionary proposals until it has demonstrated actual and sustained progress in improving its CRA performance."[15] And, the Board charged the Federal Reserve Bank of Richmond with responsibility for monitoring First Union's CRA activities and required First Union to submit quarterly reports on the steps it has taken to comply with its CRA promises to

8. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted).

9. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979) (describing in more detail constitutional and prudential components of standing).

10. 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

11. 468 U.S. at 751, 104 S.Ct. at 3324 (citation omitted).

12. *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206 (citation omitted).

13. *See* Petitioner's Brief-in-Chief, at 16 ("On behalf of [African–American businesspeople], from the southwest quarter of Orlando, Petitioner personally began his public comments about First Union, to apprise Respondent of the bank's insensitivity to the needs of Central Florida blacks with potential to benefit from bank credit.").

14. *See* Petitioner's Reply Brief, at 3 ("[Petitioner] contends here that he has a constitutionally protected liberty interest in trying to protect his reputation—and his word—against that of First Union.").

15. R12–2993 (Board Order, at 18).

the Board.[16]  In our view, the Board *upheld* petitioner's reputation and credibility by finding that First Union had poorly performed its CRA responsibilities in the past. The Board also recognized that First Union might continue to avoid implementing CRA programs and policies and therefore required monitoring of First Union's future performance.  The bare fact that the Board nevertheless approved First Union's application to acquire Florida National does not imply that First Union has fulfilled its CRA responsibilities.  By all indications, the Board's approval was made in the face of First Union's CRA performance and was based both on First Union's promises concerning future CRA compliance as well as on financial factors indicating that it was desirable that First Union preserve Florida National's operations by acquiring them. Simply as a matter of logic, we conclude that petitioner suffered no harm to his reputation or credibility—no "distinct and palpable injury to himself"—as a result of the Board's actions.

We note that petitioner has not alleged *any* other personal injury, for example, that he is a member of the class of citizens that CRA seeks to benefit; that he is a member of a minority or low- or moderate-income group that might benefit from First Union's improved CRA performance; that he resides in a minority or low- or moderate-income census tract that might benefit under the CRA; or that he has sought or is likely to seek credit from a bank owned by First Union or Florida National.

Neither do we believe that the statutory language granting the right of review of Board decisions to "[a]ny party aggrieved" [17] encompasses petitioner.  The courts have construed similar statutory language broadly.[18]  But petitioner has not alleged any direct injury to himself as the result of the Board's actions, and accordingly he cannot claim to be "aggrieved" thereby.[19]

■  Petitioner's briefs may also be interpreted as alleging standing by virtue of the fact that he participated in the administrative proceedings conducted by the Board. While such participation is a necessary prerequisite to a challenge of the Board's action,[20] it cannot by itself overcome the constitutional requirement of a direct and personal injury.  Any person may file comments on an application that is before the Board, regardless of whether he or she has been injured or will be injured by the outcome of the Board's decision.[21]

Petitioner also relies heavily on language in the Supreme Court's opinion in *Association of Data Processing Service Organizations, Inc. v. Camp* [22] to the effect that "the trend is toward enlargement of the class of people who may protest administrative action." [23]  However, these general statements do not overrule the constitutional requirement of concrete, personal injury, and they may not be applicable in a case

---

16.  *See id.*

17.  12 U.S.C. § 1848.

18.  *See, e.g., Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 208, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972) (holding that white residents of apartment complex were "person[s] aggrieved" under the Civil Rights Act of 1968 and had standing to challenge apartment owner's discrimination against black applicants).

19.  *Cf. Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA."). *See generally Investment Co. Institute v. Board of Governors of*

the Federal Reserve Sys., 606 F.2d 1004, 1010–11 (D.C.Cir.1979) (construing meaning of "[a]ny party aggrieved" language in 12 U.S.C. § 1848), *rev'd on other grounds,* 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981).

20.  *See, e.g., Gustafson v. Board of Governors of the Federal Reserve Sys.,* 717 F.2d 242, 245 (5th Cir.1983), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 821 (1984).

21.  *See* 12 C.F.R. §§ 225.14(b)(2), 262.3(b)(1), (e), 262.25(a), (b) (Federal Reserve System public notice and comment regulations).

22.  397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

23.  397 U.S. at 154, 90 S.Ct. at 830.

such as this one, not involving the Administrative Procedure Act.[24]

Without conducting further analysis, it is apparent to us that petitioner has not satisfied the constitutional standing requirement that he personally have suffered or will suffer some distinct and palpable injury. This petition is therefore DISMISSED.

**24.** *See Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757 n. 16, 93 L.Ed.2d 757 (1987).