Matthew LEE; Vielka O. Peguero; Yvonne Santana; Inner City Press/Community on the Move Homesteader's Association, Petitioners,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and the Office of Thrift Supervision, Respondents,

U.S. Trust Corporation and Chase Manhattan Corporation, Intervenors.

INNER CITY PRESS/COMMUNITY ON THE MOVE, and its members and affiliates; South Bronx/Inner City Prospective Homeowners Association; Inner City Community Development Loan Fund; South Bronx/Inner City Small Business Alliance; Matthew Lee and Vielka Peguero, Petitioners,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Respondent,

Chemical Banking Corporaton, the Chase Manhattan Corporation (collectively, the "Holding Companies"), Chemical Bank and the Chase Manhattan Bank, N.A. (collectively, the "Banks"), Intervenors.

Nos. 155, 420, Dockets 95–4134, 96–4008.

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1997.

Decided July 2, 1997.

Michael E. Deutsch, Barbara J. Olshansky, New York City (Renee Steinhagen, Laura Davis, Center for Constitutional Rights, Eric A. Klein, Cynthia Reed, New York City, of counsel), for Petitioners.

Matthew Lee, New York City, pro se.

Douglas B. Jordan, Washington, DC (James V. Mattingly, Jr., General Counsel, Richard M. Ashton, Associate General Counsel, Katherine H. Wheatley, Assistant General Counsel, Washington, DC, of counsel), for Respondent Board of Governors of the Federal Reserve System.

Aaron B. Kahn, Washington, DC (Carolyn J. Buck, Chief Counsel, Thomas J. Segal, Deputy Chief Counsel, Washington, DC, of counsel), for Respondent Office of Thrift Supervision.

Warren W. Traiger, New York City (Joseph Calluori, New York City, of counsel), for Intervenor U.S. Trust Corporation.

Mark Segal, New York City (Patricia M. Kelly, Betty Y. Yan, Chemical Bank Legal Department, New York City, of counsel), for Intervenor Chemical Banking Corporation and Chemical Bank.

Kent T. Stauffer, Matthew G. Leonard, New York City, for Intervenor Chase Manhattan Corporation.

Melvyn L. Cantor, Eric S. Kobrick, Simpson Thacher & Bartlett, New York City, for Intervenors Chemical Banking Corporation, The Chase Manhattan Corporation, Chemical Bank and The Chase Manhattan Bank, N.A.

Before: VAN GRAAFEILAND and LEVAL, Circuit Judges, and SQUATRITO, District Judge.[*]

VAN GRAAFEILAND, Circuit Judge:

At issue herein are two petitions brought pursuant to section 9 of the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1848, and section 10(j) of the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1467a(j), seeking to overturn three orders of the Board of Governors of the Federal Reserve System ("the Board") and one order of the Director of the Office of Thrift Supervision ("OTS"). In action number 95–4134, Matthew Lee, Vielka Peguero, Yvonne Santana and Inner City Press/Community on the Move Homesteader's Association petition for review of the Board's orders approving Chase Manhattan Corporation's application to acquire certain businesses controlled by United States Trust Corporation ("UST"). In action number 96–4008, Inner City Press/Community on the Move, South Bronx/Inner City Prospective Homeowners Association, Inner City Community Development Loan Fund, South Bronx/Inner City Small Business Alliance, Lee and Peguero petition for review of the Board's order approving the merger of Chase into Chemical Banking Corporation. On May 16, 1996, this Court consolidated the two petitions for argument and decision.

The petition in 95–4134 involves a somewhat complicated arrangement between Chase and UST for the sale to Chase of UST's securities processing businesses. First, UST transferred all of its non-securities processing businesses to a newly created holding company, New UST Holdings Corporation ("New UST"). UST, then consisting of only the securities processing businesses, merged into Chase.

Because the transaction involved a merger of two bank holding companies and Chase's acquisition of a banking subsidiary, U.S. Trust Company of New York ("USTNY"), Chase was required to obtain the Board's approval pursuant to section 3 of the BHCA, 12 U.S.C. § 1842. Under this section, the Board, after receiving the recommendation of the Office of the Comptroller of the Currency ("OCC") or the applicable state supervisory agency, must evaluate an application pursuant to a number of factors: the anti-competitive effects of the proposal, the financial and managerial resources of the company and the banks involved and the "needs of the community to be served." 12 U.S.C. § 1842(c)(2).

Section 4(a) of the BHCA, 12 U.S.C. § 1843(a)(2), prohibits a bank holding compa-

---

[*] The Honorable Dominic J. Squatrito, United States District Judge for the District of Connecticut, sitting by designation.

ny, such as Chase, from retaining "direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company." The statute also prohibits bank holding companies from engaging in any activities other than those of banking or of managing or controlling banks, but exempts from this prohibition the ownership of:

> shares of any company the activities of which the Board ... has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. . . .

12 U.S.C. § 1843(c)(8). *See Citicorp v. Board of Governors*, 936 F.2d 66, 68 (2d Cir.1991), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992); *National Ass'n of Cas. & Sur. Agents v. Board of Governors*, 856 F.2d 282, 284 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989). Because Chase would be acquiring two non-banking subsidiaries of UST, U.S. Trust Company of Wyoming ("USTWY") and Mutual Funds Service Company ("MFSC"), Chase filed a notice of its intent to engage in non-banking activities pursuant to § 1843(c)(8). *See* 12 C.F.R. § 225.23.

UST also needed the Board's approval under section 3 in order to form New UST (the new bank holding company) and was required to file notices pursuant to section 4(c)(8) to permit New UST to engage in the non-banking activities that UST previously performed. Moreover, because New UST would be acquiring UST's thrift subsidiary, UST also was required to obtain approval of the OTS pursuant to section 10(e) of HOLA, 12 U.S.C. § 1467a(e).

The petition in 96–4008 involves the Board's approval of a number of applications permitting the merger of Chase into Chemical. The mechanics of the transaction, put simplistically, entailed the merger of the two holding companies, the merger of each company's lead bank subsidiaries and the acquisition by Chemical of Chase's non-banking

subsidiaries. The parties, therefore, were required to obtain approval of the Board pursuant to sections 3 and 4 of the BHCA as well as the approval of a number of other federal and state agencies not relevant here. Chase and Chemical filed the appropriate applications with the Board on October 3, 1995.

Under the Board's regulations implementing the BHCA, the public must be given notice of an application and may submit comments to the Board. *See* 12 C.F.R. § 262. Petitioner Inner City Press/Community on the Move ("ICP"), an association of low-income residents of New York City, presented the Board and OTS with a number of objections to both the Chase–UST applications and the Chase–Chemical applications. ICP's concerns were based principally on the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901 *et seq.* The CRA provides that "regulated financial institutions have [a] continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901(a)(3). To police this obligation, the CRA provides that a federal regulatory agency must "assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods ... and ... take such record into account in its evaluation of an application for a deposit facility by such institution." 12 U.S.C. § 2903(a)(1) & (2). Nearly identical regulatory schemes implementing the CRA have been adopted by the Board and OTS. *See* 12 C.F.R. §§ 228 *et seq.; id.* §§ 563e *et seq.*

Petitioners' comments notwithstanding, each of the applications was approved by the appropriate federal agency. The Board approved the Chase–UST transaction pursuant to sections 3 and 4 of the BHCA in two orders dated July 24, 1995. OTS's approval of UST's application followed shortly thereafter on August 18, 1995.[1] On August 22, 1995, the three individual petitioners in number 95–4134 and ICP timely petitioned this Court for review. The Board approved the Chase–

---

1. The transaction also was approved by the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the New York State Banking Board and the New York State Banking Department.

Chemical merger in an order dated January 5, 1996, and the petition to review that order in number 96–4008 followed on January 19, 1996. Original jurisdiction in this Court is based on 12 U.S.C. § 1848 and 12 U.S.C. § 1467a(j), each of which provides that any aggrieved party may seek review of an order of the Board or the OTS, respectively, in the United States Court of Appeals for the jurisdiction in which the party maintains its business.

In addition to defending the orders on their merits, respondents question whether any of the named petitioners have standing to pursue these matters, both because some failed to participate in the proceedings below and because none has alleged an injury flowing from the orders at issue sufficient to bring the matter within the case or controversy requirement of Article III.

For the reasons hereinafter discussed, we believe that petitioners have failed to demonstrate standing to pursue this litigation. However, because we are satisfied that petitioners' claims are without merit and it is important that the issues arising out of the several mergers finally be disposed of, we will address the lack-of-merit issue as an alternate ground for dismissing the petitions. *See State of New York v. Reebok Int'l Ltd.*, 96 F.3d 44, 48–49 (2d Cir.1996).

## Discussion

### *Standing*

■ Article III of the Constitution limits the authority of the federal courts to decide only actual cases and controversies. *See Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The Supreme Court has recognized that a litigant's stake in the controversy must extend beyond mere interest in a dispute, and the doctrine of standing has developed to ensure the presence of "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The standing doctrine is rooted firmly in Article III, but it also implicates so-called prudential limitations on a court's authority to hear a case. "In both

dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). As with questions of jurisdiction generally, the party invoking the authority of the court bears the burden of proof on the issue of standing. *Id.* at 501–02, 95 S.Ct. at 2206–07.

The constitutional limitations of Article III demand that petitioners demonstrate injury flowing from the challenged orders. The Court's most recent pronouncement on this "'irreducible constitutional minimum'" of standing requires a showing:

> (1) that the plaintiff[s] have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of— the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, — U.S. —, —, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)).

The petitioners in the instant case fall into three overlapping categories: (1) individual residents of the South Bronx; (2) customers of Chemical (and now, presumably, Chase); and (3) various community organizations. They allege several different injuries in support of their standing in this case. First, they contend that their "extensive participation" below confers the right to challenge the outcomes of the various proceedings. Next, petitioners allege that some unidentified members of ICP "have ... been denied credit from the banks in their community" and "are likely to seek credit from banks in their community" in the future. Because the Board and OTS ignored the banks' allegedly poor CRA performance, the argument goes, these individuals will be less likely to obtain

desired financial services. ICP and Lee also contend that, as customers of Chemical, they stand to suffer from the anti-competitive effects of the merger of Chase and Chemical.

■ We reject petitioners' contention that their participation in the administrative process confers standing in this case. While the Supreme Court has recognized that " 'procedural rights' are special," *Defenders of Wildlife, supra,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142–43 n. 7, it has done so only in the context of relaxing "all the normal standards for redressability and immediacy," *id.* The Court expressly has disavowed the argument that a procedural deficiency can satisfy the concrete-injury requirement "without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed)." *Id.* at 573 n. 8, 112 S.Ct. at 2143 n. 8. *See Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664–65 (D.C.Cir.1996) (in banc).

■ To be sure, Congress can create new legal rights and obligations inuring to an individual and thereby confer standing on prospective litigants that otherwise would be lacking. *See Defenders of Wildlife, supra,* 504 U.S. at 577–78, 112 S.Ct. at 2145–46; *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148–49 n. 3, 35 L.Ed.2d 536 (1973); *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.,* 985 F.2d 1148, 1153 (2d Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). We cannot agree, however, with petitioners' implicit suggestion that it has done so in this case.

■ Petitioners find an analogue to their cause in the National Environmental Policy Act ("NEPA"), which establishes procedures that a federal agency must follow in evaluating the impact of its proposed activities on the environment. *See Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 448 (10th Cir.1996). As the Tenth Circuit explained, because

> [a]n agency's failure to follow [NEPA's] prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention ... an

injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III.

*Id.* at 448–49. That this danger of "uninformed decisionmaking" may support a person's standing to challenge a procedural irregularity under NEPA, however, does not dispense with the constitutional requirement that the "plaintiff be among the injured." *Id.* at 449. " '[Statutory] broadening [of] the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury.' " *Defenders of Wildlife, supra,* 504 U.S. at 578, 112 S.Ct. at 2145–46 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1367–68, 31 L.Ed.2d 636 (1972)); *see also id.* at 580, 112 S.Ct. at 2146–47 (Kennedy, J., concurring). Mere participation in the proceedings below does not vest petitioners with such status. Although we agree with the District of Columbia Circuit's view that such participation generally is a prerequisite to review under the BHCA, *see, e.g., Jones v. Board of Governors,* 79 F.3d 1168, 1171 (D.C.Cir.1996), it is only a starting point, and does nothing to ensure that the aggrieved participant has been injured within the dictates of Article III.

■ In support of their claim of injury, petitioners rely heavily upon the Eleventh Circuit's *per curiam* opinion in *Kaimowitz v. Board of Governors,* 940 F.2d 610 (11th Cir. 1991). Kaimowitz, who apparently had represented minority business people in the Orlando, Florida area, petitioned the Eleventh Circuit for review of a Board order under the BHCA approving the acquisition of a Florida bank by First Union Corporation. In rejecting Kaimowitz's claim that the diminution of his reputation allegedly resulting from the granting of the application amounted to the "distinct and palpable injury" required by Article III, the court remarked:

> We note that petitioner has not alleged any other personal injury, for example, that he is a member of the class of citizens that CRA seeks to benefit; that he is a member of a minority or low- or moderate-income group that might benefit from

First Union's improved CRA performance; that he resides in a minority or low- or moderate-income census tract that might benefit under the CRA; or that he has sought or is likely to seek credit from a bank owned by First Union or Florida National.

*Id.* at 613. Touting this dictum as if it were the court's holding, petitioners base their standing argument on the fact that members of ICP, unlike Kaimowitz, are minorities as well as residents of low- and moderate-income neighborhoods. Since the CRA was designed to protect such groups, petitioners allege, they are within its "zone of interests" and therefore entitled to bring suit to enforce it terms. *But see Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir.1992) ("There is no language which suggests that the [CRA] was intended to prevent racially discriminatory lending policies or minority 'redlining'....").

■ The zone-of-interests test, however, does not aid petitioners in this case. This test is derived from the prudential component of standing and attempts to ensure "that a plaintiff's grievance ... arguably fall[s] within the zone of interests protected or regulated by the statutory or constitutional guarantee invoked in the suit." *Bennett, supra*, —— U.S. at ——, 117 S.Ct. at 1161. Alleging that one is within the zone of interests of a statutory provision does not dispense with the constitutional necessity that one demonstrate an imminent, concrete and particularized injury. "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club, supra*, 405 U.S. at 734–35, 92 S.Ct. at 1366.

■ Petitioners vaguely allege that some unidentified members of ICP have been denied credit in the past and that still other unidentified members intend to apply for credit in the future. Notably absent from either petition is an allegation that any of the banks involved in this proceeding have been or will be involved in petitioners' plans. For example, despite petitioners' allegations of racial discrimination and their indictment of the Board and OTS for their complicity in such acts, not one member of ICP has come forward with so much as an allegation, much less evidence, that he or she has suffered from such discriminatory practices. *See Warth, supra*, 422 U.S. at 502, 95 S.Ct. at 2207 ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.").

■ Even assuming that the activities of other banks are relevant to the instant petitions, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Defenders of Wildlife, supra*, 504 U.S. at 564, 112 S.Ct. at 2138 (internal quotation marks omitted). Because neither petition alleges any details of past denials of credit suffered by ICP members, it is impossible to discern any allegation of such effects. Moreover, with respect to future injury, the Court has held that the prospect of such harm must be " 'certainly impending,' " *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979), and " 'real and immediate,' " *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). In short, the petitions allege " 'some day' intentions ... [which] do not support a finding of the 'actual or imminent' injury that [the Court's] cases require." *Defenders of Wildlife, supra*, 504 U.S. at 564, 112 S.Ct. at 2138.

■ Petitioners also fail to meet the remaining constitutional elements of standing. In *Defenders of Wildlife, supra*, the Court emphasized that standing is "substantially more difficult to establish" in cases where "the plaintiff is not himself the object of the government action or inaction he challenges." 504 U.S. at 562, 112 S.Ct. at 2137 (internal quotation marks omitted). This stems not from the absence of concrete injury but rather from want of the remaining constitutional elements of standing: causation and redressability. The Court observed:

When ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed [than in cases where the plaintiff is the object of government action]. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Id.* (internal quotation marks and citations omitted).

The CRA is an amorphous statute. Its pronouncement that "regulated financial institutions have [a] continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered," 12 U.S.C. § 2901(a)(3), is not a directive to undertake any particular program or to provide credit to any particular individual. The statute, rather, is precatory:

It is the purpose of this chapter to require each appropriate Federal financial supervisory agency to use its authority when examining financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions.

12 U.S.C. § 2901(b). As petitioners concede, the CRA does not create a private right of action to enforce any of its terms. *See Hicks, supra,* 970 F.2d at 382 (no implied right of action under CRA). Moreover, any attempt to glean substance from the CRA is met with the reality that the statute sets no standards for the evaluation of a bank's contribution to the needs of its community. H.R. Conf. Rep. No. 95–634, at 76, *reprinted in* 1977 U.S.C.C.A.N. 2965, 2995 ("This title ... [is] designed to encourage more coordinated efforts between private investment and federal grants and insurance in order to increase the viability of our urban communities.").

▉ Petitioners alternately put forth an antitrust injury to support their standing argument. This theory is based on two factual assertions. First, since two petitioners are customers of Chemical, they will be harmed by the anti-competitive effects of the merger. Second, petitioner Inner City Community Development Loan Fund ("ICCDLF"), an ICP "affiliate," "was incorporated to make very small 'micro-' loans to small businesses and housing-seekers [and] would suffer competitive injury" from Chase's superior market power. Neither assertion has merit.

Petitioners' argument with respect to ICCDLF is based on 12 U.S.C. § 1850, which provides in relevant part that in any proceeding before the Board pursuant to sections 3 or 4 of BHCA:

a party who would become a competitor of the applicant or subsidiary thereof by virtue of the applicant's or its subsidiary's acquisition ... shall have the right to be a party in interest in the proceeding and, in the event of an adverse order of the Board, shall have the right as an aggrieved party to obtain judicial review thereof as provided in section 1848 of this title or as otherwise provided by law.

Notwithstanding the professed reasons for incorporating ICCDLF, petitioners fail to allege that the organization has ever made a single loan. Absent such an allegation, it is difficult to see how this organization could be harmed by the orders at issue. *Cf. In re United States Catholic Conference,* 885 F.2d 1020, 1029 (2d Cir.1989) (noting that to show competitor standing "a plaintiff must show that he personally competes in the same arena"), *cert. denied,* 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990). More importantly, however, is ICCDLF's failure to appear in the proceedings below. As stated above, such participation is a prerequisite to bringing suit under 12 U.S.C. § 1848.

In support of the final argument, petitioners assert that "ICP is a customer of Chemical Bank, as is Petitioner Lee." According to petitioners, because consumers who pay more for goods acquired for personal use suffer an injury in their "business or property" for purposes of the Clayton Act, *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 341, 99 S.Ct. 2326, 2332, 60 L.Ed.2d 931 (1979), petitioners here will be harmed by the market power enjoyed by Chase following the merger. Aside from the completely speculative nature of this argument, we hold that petitioners' argument fails on an even more fundamental level. Petitioners provide no citation to the record for the factual assertion that ICP or Lee are customers of Chemical. We have examined the two lengthy petitions for some supporting allegation and have found none. Fed. R.App. P. 28(a)(6); *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 602 (2d Cir.1978). In any event, an allegation of antitrust injury would relate only to the antitrust claims; it would not confer standing with respect to the main claims advanced by the petitioners. Even assuming that ICP and Lee have standing to assert antitrust claims as customers of Chemical, those claims are meritless, as discussed below.

### Merits

Examining alternately the merits of the petitions, we are satisfied that the orders at issue warrant affirmance, especially in light of our deferential standard of review. Under the BHCA, the Board's findings are conclusive so long as they are supported by substantial evidence. 12 U.S.C. § 1848. This standard has been described as a "specific application" of the "arbitrary and capricious" standard of review familiar in the administrative law context. *See Association of Data Processing Serv. Orgs. v. Board of Governors*, 745 F.2d 677, 683 (D.C.Cir.1984). Although we, of course, have the ultimate say on the legal issues involved in this proceeding, the Board is the agency responsible for federal regulation of the national banking system, and *its interpretation of pertinent federal statutes is entitled to substantial deference. Securities Industry Ass'n v. Board of Governors*, 468 U.S. 137, 142, 104 S.Ct.

2979, 2982, 82 L.Ed.2d 107 (1984); *see also Citicorp, supra*, 936 F.2d at 72–73. Pursuant to 12 U.S.C. § 1467a(j), an OTS order under HOLA is reviewed under the standards set out in the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Under the APA, administrative action is reviewable to the extent it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

As stated above, the CRA imposes an obligation on a federal regulatory agency to "assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods" and to "take such record into account in its evaluation of an application for a deposit facility by such institution." 12 U.S.C. § 2903(a)(1) & (2). After reviewing the orders at issue, we have no doubt that this mandate was carried out in these cases.

Each of the Board orders at issue clearly addresses the relevant institutions' CRA records in its analysis of the convenience and needs of the communities to be served, as required by section 3 of the BHCA. For example, the Board's order approving the Chase–Chemical merger is seventy-two pages long, forty-five pages of which are devoted to an exhaustive analysis of Chase and Chemical's performance in meeting the goal of the CRA.

We find no error in the Board's reference to prior CRA evaluations conducted by the OCC, a major focus of both petitions' attack on the Board's assessment of Chase. For one thing, Congress has directed the Board to use OCC examinations in its evaluation of BHCA applications. 12 U.S.C. § 1844(c). Insofar as the Board's regulations reflect interest in potentially stale information, the record reveals that the Board considered its comprehensive analysis of Chase's CRA performance in an earlier proceeding, 81 Fed. Res. Bull. 467 (1995), in connection with the instant applications. Petitioners cite no authority to contravene this practice, and, as a court with an ever-expanding docket, we believe that an agency should be permitted to develop efficient means of resolving recurring issues so long as the

essential fairness of the proceeding is not affected thereby. In any event, it is clear that the Board did not "abdicate" its duties under the CRA by taking into account either the OCC evaluations or its prior order. The orders at issue reflect an independent, detailed assessment of Chase's CRA record.

Petitioners' complaints in this Court are not so much about what the Board did as they are about what it failed to do. According to petitioners, the considerable record before the Board and its detailed findings are quite irrelevant if the Board failed to consider the arguments petitioners advanced against the proposals or failed to rationally articulate the bases for its actions. These are sound principles of administrative law, *see Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983), but we fail to see how they can be applied here to undermine the Board's orders.

With respect to the Chase applications, ICP contended before the Board that Chase's CRA performance had been inadequate. Included in this claim was the assertion that the Chase Direct program, which waives electronic banking fees if the customer has a minimum $6,000 balance, was discriminatory. ICP also argued that the data provided by Chase pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801 *et seq.,* indicated that Chase had engaged in discriminatory mortgage lending practices and that Chase was engaged in "pre-screening" of loan applicants in the South Bronx. This conduct, according to ICP, violated the HMDA, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 *et seq.,* and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.* Petitioners made virtually identical allegations regarding Chemical's CRA record.

ICP also challenged UST's CRA performance. It argued that UST had failed to comply with the reporting requirements of HMDA by refusing to solicit the race of loan applicants. In addition to violating HMDA and the fair lending laws, this disregard of federal reporting laws allegedly made it impossible to evaluate UST's CRA perfor-

mance. ICP also contended that UST "redlined" its service community by excluding virtually all low- and moderate-income neighborhoods in New York City. Finally, ICP claimed that UST had operated non-banking subsidiaries, USTWY and MFSC, without Board approval in violation of section 4(a) of the BHCA, 12 U.S.C. § 1843(a), and section 16 of the Glass–Steagall Act, 12 U.S.C. § 24(seventh).

Contrary to petitioners' contentions, the Board carefully considered the concerns expressed by the commentators objecting below. The Board noted that, despite ICP's allegations, all of the subsidiary banks involved had received "outstanding" or "satisfactory" CRA ratings from the OCC and that OCC examiners had found no evidence of illegal credit practices. The Board's orders also catalogue each institution's continuing efforts to assist in meeting the housing-related credit needs of individuals living in low- and moderate-income areas, including the pledge on behalf of "New Chase" to implement an $18.1 billion five-year, nationwide community investment plan.

With regard to petitioners' specific complaints, we are satisfied that the Board properly resolved each issue. The Board concluded that HMDA data standing alone are not sufficient for conclusively determining whether an institution has engaged in illegal discrimination in making lending decisions. Because the Board is one of the regulatory agencies charged with the responsibility of administering the CRA, its decisions on such matters are entitled to substantial deference, and we find no error in its conclusion. *See Securities Indus. Ass'n, supra,* 468 U.S. at 142, 104 S.Ct. at 2982. Nor can we fault the Board's finding that UST was not remiss in failing to record the race and gender of its loan applicants in view of the fact that banks are exempted from this reporting requirement when applications are taken over the telephone. *See* 12 C.F.R. Pt. 203, App. A, § V(D)(2); *id.* App. B, § I(B)(4). We defer to the Board's interpretation of these regulations as applied to the particular facts.

■ Petitioners also argued that certain electronic banking programs administered by Chase and Chemical amounted to "disparate impact discrimination under ECOA." These programs, which waive transaction fees for customers with relatively high minimum balances, were said to have a disproportionate impact on low- and moderate-income customers who, "given the demographics by race and income of New York City," are disproportionately minorities. Petitioners argue that the Board's finding of no evidence of discriminatory effect of these policies is arbitrary and capricious because the Board failed to follow its policy statement regarding "discrimination in lending." However, discrimination in lending has nothing to do with the banks' electronic banking programs. Moreover, as the Board observed, the type of discount at issue is expressly permitted by the applicable regulations. *See* 12 C.F.R. § 225.7(b)(4).

■ The Board also considered and rejected petitioners' argument that UST's operation of USTWY and MFSC without prior Board approval warranted denial of UST's applications under section 4(c)(8) of the BHCA. Because the purpose of the Chase–UST applications was to transfer ownership of these subsidiaries from UST to Chase, we cannot say that the Board's refusal to sanction UST was arbitrary or capricious.

In each case, the Board concluded that the factors relevant under the BHCA, *i.e.* the convenience and needs of the communities to be served, competitive considerations and managerial resources, were favorable to the applications. While the OTS order is much less detailed, in the light of its references to the record we are quite able to discern its decisionmaking path and therefore deem it sufficient. *See Torrington Extend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580, 590 (2d Cir.1994). In short, we are satisfied that each agency "has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *New York Council, Ass'n of Civilian Technicians v. Federal Labor Relations Auth.,* 757 F.2d 502, 508 (2d Cir.) (internal quotation marks omit-

ted), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985).

■ Petitioners also contend that the Board's orders must be set aside because the Board approved the various applications without conducting an evidentiary hearing. At the relevant time, decisions under section 4 of the BHCA could be made only "after due notice and opportunity for hearing." 12 U.S.C.A. § 1843(c)(8) (1989). The Board's regulations reasonably require a protestant seeking a hearing to submit "a statement of why a written presentation would not suffice in lieu of a hearing, identifying specifically any questions of fact that are in dispute and summarizing the evidence that would be presented at a hearing." 12 C.F.R. § 262.3(e). We find no error in the Board's application of this regulation to these cases.

■ Petitioners failed to request a hearing in the Chase–Chemical proceeding, and therefore their argument that a hearing was required will not be entertained in this Court. With regard to the Chase–UST proceeding, the only marginally relevant factual dispute we can discern from the record relates to Chase's alleged prescreening of loan applicants in the South Bronx. The Board, however, reasonably found that any involvement by Chase in such conduct was limited to its participation in a program administered by the New York City Housing Partnership, one of the largest affordable housing construction projects in New York City, and that any responsibility for reporting violations rested with the Partnership, not Chase. Although "the Board cannot lightly dismiss a protestant's request for an evidentiary hearing" when there is a material fact in dispute, the "Board is not to be burdened with a hearing requirement where a protestant has not given reason to believe a hearing would be worthwhile." *Connecticut Bankers Ass'n v. Board of Governors,* 627 F.2d 245, 251 (D.C.Cir.1980).

Finally, we reject petitioners' challenge to the Board's orders based on the alleged anti-competitive effects of the Chase–Chemical merger. Petitioners base this argument on their contention that the Bronx should have been viewed as a separate banking market in

determining the concentration of the market. The Board, however, found that the Bronx is not a distinct banking market. Given the Board's expertise in evaluating the competitive structure of the areas involved and its comprehensive analysis, we conclude that this finding is amply supported by the record. *See Grandview Bank & Trust Co. v. Board of Governors,* 550 F.2d 415, 420 (8th Cir.) (noting "great weight" to be given to Board's definition of relevant market), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977).

We have considered petitioners' other contentions and find them to be without merit.

### Conclusion

For the reasons expressed above, we hold that petitioners have not demonstrated standing to challenge the orders at issue. We hold in the alternate that the petitions fail on their merits. The petitions, accordingly, are dismissed.

